IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
APPLE IPHONE SE, CURRENTLY
LOCATED AT FBI WASHINGTON FIELD
OFFICE, 601 FOURTH STREET N.W.,
WASHINGTON D.C., 20535

Case No. _____

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Jeffrey Weeks, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property—an

electronic device—which is currently in law enforcement possession, and the extraction from

that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have

been since April 2005.  I am currently assigned to a complex financial crimes squad at the

Washington Field Office of the FBI in Manassas, Virginia.  My involvement in this investigation

has included interviewing victims and other witnesses, reviewing financial and other records

provided by numerous financial institutions and other entities, and reviewing reports of

interviews prepared by other law enforcement agents involved in this investigation.  I have also

reviewed numerous e-mails sent to or from accounts belonging to James Pierce ("Pierce"), who

as described below was charged by indictment in *United States v. James Pierce* (D.D.C. Case

No. 18-CR-230) on July 31, 2018.  These have included emails obtained pursuant to a search

warrant of Pierce's co-conspirator MM's account authorized on April 12, 2017 by U.S.
Magistrate Judge Deborah A. Robinson.[1]

3.      This affidavit is intended to show only that there is sufficient probable cause for
the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.      The property to be searched is an Apple iPhone SE, IMEI number
358541079454238, hereinafter the "Device." The Device is currently located at the FBI
Washington Field Office located at 601 Fourth Street N.W., Washington D.C., 20535.

5.      The applied-for warrant would authorize the forensic examination of the Device
for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6.      On July 26, 2018, Magistrate Judge Deborah A. Robinson issued an arrest warrant
for Pierce pursuant to a Complaint charging him with conspiracy to commit wire fraud under 18
U.S.C. § 371. The FBI arrested Pierce that day. The Complaint was supported by a Complaint
Affidavit, which was sworn to by FBI Special Agent Gregory S. Fine (the "Fine Affidavit").
The Fine Affidavit is being submitted in connection with the instant application as Exhibit A,
and is incorporated by reference herein.

7.      On July 31, 2018, a grand jury in the District of Columbia returned a three count
Indictment charging Pierce with one count of conspiracy to commit wire fraud under 18 U.S.C. §

---

[1] Judge Robinson also authorized a search warrant of Pierce's e-mail account on July 10, 2017, but the
execution of that warrant did not return any e-mails.

1349 and two counts of wire fraud under 18 U.S.C. § 1343. The Indictment is submitted in connection with the instant application as Exhibit B, and is incorporated by reference herein.

      8.      In summary, the Indictment (and the Complaint) allege that from at least in or about February 2011 and continuing until at least in or about October 2013, Pierce, together with his co-conspirators, defrauded victims by telling them that, in exchange for an upfront payment, the co-conspirators would arrange for a bank in the Dominican Republic ("Bank 1") to issue SWIFT messages showing that the victims had access to funds on deposit at Bank 1. As part of their pitch and at Pierce's direction, the co-conspirators represented that they had access to funds at Bank 1. In fact, the co-conspirators neither controlled accounts at Bank 1 nor had the ability to cause Bank 1 to issue the SWIFT messages they promised to the victims. Instead, Pierce and his co-conspirators provided victims with fake SWIFT messages that purported to show that Bank 1 had issued SWIFT messages as promised. After the victims confronted Pierce and his co-conspirators, who had failed to follow through on their promises, they offered a number of excuses and false statements, including that Bank 1 had in fact sent the SWIFT messages and that the receiving banks had confirmed their receipt. Pierce and his co-conspirators also attempted to discourage the victims from contacting Bank 1 directly, in order to conceal the conspiracy.

Evidence of Additional Fraudulent Transactions

      9.      The FBI's investigation has revealed evidence that Pierce has continued to participate in fraudulent SWIFT message transactions past the time period of the conduct charged in the Indictment, which ends in October 2013. For example, Victim A stated to the FBI that in May 2016, Pierce forwarded him a copy of a SWIFT MT-799 message that appeared to have been sent from Bank 2 to an Asian bank. The SWIFT message purported to show that

3

Bank 2 had "blocked" $300 million in an account in the name of Victim A's Company. The "transmission time" listed on the purported SWIFT message that Pierce forwarded to Victim A, however, was nearly identical to the transmission times on two previous versions of the purported SWIFT message that Pierce had sent Victim A, neither of which were successfully transmitted. This indicates that the copy of the SWIFT message that Pierce sent to Victim A was not legitimate.

10.     Additionally, the FBI has spoken to another individual, Victim D, who paid a total of $45,000 to obtain a purported Standby Letter of Credit (SBLC) from Bank 3 in late 2016 and early 2017 pursuant to an agreement with Individual A. Victim D's first transaction failed after she paid $15,000. At the request of Individual A, Victim D then made a second payment of $30,000 directly to Pierce. In response, Victim D received a purported e-mail from Bank 3, in which Bank 3 appeared to request more information to process Victim D's transaction. Victim D responded to the e-mail, but received an error message that the recipient's e-mail address was not valid. A representative of Victim D later contacted Bank 3 to inquire about the transaction, and Bank 3 confirmed that the documents related to the transaction were not legitimate. After repeated attempts to contact Pierce, Victim D finally received a refund of her second payment of $30,000 after contacting the FBI in September 2017. According to Victim D, the designated receiving bank never received the promised SBLC.

11.     Bank records obtained in the FBI's investigation show that Pierce and Individual A have engaged in transactions since then as well. Most recently, an account controlled by Pierce received a wire transfer of $70,000 on June 25, 2018 from what appears to be the account of an escrow attorney in connection with a transaction involving Individual A. The next day,

4

June 26, 2018, Pierce then transferred $10,000 to a bank account in the name of an entity controlled by Individual A.

12.      Finally, bank records obtained in the FBI's investigation show that Pierce and the individual identified as CC-1 in the Fine Affidavit have continued to participate in transactions together.[2] A review of Pierce's bank records shows that in 2016 and 2017, Pierce wired at least $250,000 to an account controlled by CC-1's wife.

Messages on the Device Evidencing Similar Transactions Involving SWIFT Messages

13.      As described above, the FBI arrested Pierce on Thursday, July 26, 2018 pursuant to an arrest warrant issued by Magistrate Judge Deborah A. Robinson. Pierce had the Device on his person, and the FBI seized the Device incident to Pierce's arrest. At the time the FBI obtained it, the Device was powered on. I obtained the Device after Pierce's arrest. Then as I was riding as a passenger in the car on the way to process Pierce following his arrest, I was holding the Device. Although the Device appeared to be locked, its settings were configured in such a way that I could observe previews of incoming WhatsApp[3] text messages appear on the Device's screen. As I was holding the Device, I observed WhatsApp messages pop up on the screen that appeared to relate to a deal not going through and a SWIFT message not being

---

[2] As described in the Fine Affidavit, in 2011, Victim A informed Pierce that it looked like Pierce and the purported escrow agent for Victim A's transaction (CC-1) were defrauding him. Victim A later received a refund of his payment for the Bank 1 documentation that he had been promised, but only after Victim A reported CC-1 to the Florida Bar for the unauthorized practice of law, and Pierce attempted to have Victim A sign a document releasing CC-1 from Victim A's claims with the Florida Bar. Likewise, during the alleged fraudulent transactions for Victim B and Victim C in 2013, bank records show that Pierce · shared the proceeds from the fraudulent scheme with CC-1 by transferring a portion of the funds that Pierce received from the victims to an account controlled by CC-1.

[3] WhatsApp is a service that allows users to transmit messages electronically using the Internet.

delivered. These messages came into my view without me touching the screen or pushing
buttons on the Device.

14.     I immediately recognized that the messages were relevant to the FBI's
investigation, and in order to document the messages, within several minutes I took photographs
of them. I also took photographs of other messages that the Device later received. In order to
take some of the photographs, I touched the phone and, without unlocking it, scrolled through
previews of several of the WhatsApp messages. In order to take other photographs, I likely
pushed the circular "Home" button in order to display the message previews on the screen –
again, without unlocking the phone. Out of an abundance of caution, I am not relying on these
photographs in support of this warrant application.

15.     The content of the messages that I observed without touching the screen or
pushing buttons on the Device appeared to relate to a deal not going through and a SWIFT
message not being delivered. That content was similar to the failed transactions for Victim A,
Victim B, and Victim C, as described in the Fine Affidavit, which caused me to conclude that
Pierce was continuing with the same scheme alleged in the Indictment. After Pierce and his co-
conspirators would falsely represent to a victim that Bank 1 had sent a SWIFT message to the
victim's designated bank, they would provide the victim with a fake copy of the purported
SWIFT message. Since Bank 1 never actually sent the SWIFT message, the victim would never
be able to confirm with the designated receiving bank that it had received the SWIFT message –
which appeared to be similar to the situation unfolding in the WhatsApp messages that I
observed. Additionally, as set forth more fully in Exhibit A, the FBI's investigation has revealed
that Pierce and his co-conspirators frequently communicated with each other and with victims by

· electronic means, including by e-mail and Skype[4] message.  That corresponds with the electronic

communications that Pierce is receiving on the Device.

16.    The Device is currently in storage at the FBI Washington Field Office at 601

Fourth Street N.W., Washington D.C., 20535.  In my training and experience, I know that the

Device has been stored in a manner in which its contents are, to the extent material to this

investigation, in substantially the same state as they were when the Device first came into the

possession of the FBI.

## TECHNICAL TERMS

17.    Based on my training and experience, I use the following technical terms to

convey the following meanings:

    a.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular

        telephone) is a handheld wireless device used for voice and data communication

        through radio signals.  These telephones send signals through networks of

        transmitter/receivers, enabling communication with other wireless telephones or

        traditional "land line" telephones.  A wireless telephone usually contains a "call

        log," which records the telephone number, date, and time of calls made to and

        from the phone.  In addition to enabling voice communications, wireless

        telephones offer a broad range of capabilities.  These capabilities include: storing

        names and phone numbers in electronic "address books;" sending, receiving, and

        storing text messages and e-mail; taking, sending, receiving, and storing still

---

[4] Skype is a service that allows users to communicate electronically using the Internet, including through
voice, video, and text communication.

photographs and moving video; storing and playing back audio files; storing

dates, appointments, and other information on personal calendars; and accessing

and downloading information from the Internet. Wireless telephones may also

include global positioning system ("GPS") technology for determining the

location of the device.

b.   Digital camera: A digital camera is a camera that records pictures as digital

picture files, rather than by using photographic film. Digital cameras use a

variety of fixed and removable storage media to store their recorded images.

Images can usually be retrieved by connecting the camera to a computer or by

connecting the removable storage medium to a separate reader. Removable

storage media include various types of flash memory cards or miniature hard

drives. Most digital cameras also include a screen for viewing the stored images.

This storage media can contain any digital data, including data unrelated to

photographs or videos.

c.   Portable media player: A portable media player (or "MP3 Player" or iPod) is a

handheld digital storage device designed primarily to store and play audio, video,

or photographic files. However, a portable media player can also store other

digital data. Some portable media players can use removable storage media.

Removable storage media include various types of flash memory cards or

miniature hard drives. This removable storage media can also store any digital

data. Depending on the model, a portable media player may have the ability to

store very large amounts of electronic data and may offer additional features such

as a calendar, contact list, clock, or games.

8

d.  GPS: A GPS navigation device uses the Global Positioning System to display its
current location. It often contains records the locations where it has been. Some
GPS navigation devices can give a user driving or walking directions to another
location. These devices can contain records of the addresses or locations involved
in such navigation. The Global Positioning System (generally abbreviated
"GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite
contains an extremely accurate clock. Each satellite repeatedly transmits by radio
a mathematical representation of the current time, combined with a special
sequence of numbers. These signals are sent by radio, using specifications that
are publicly available. A GPS antenna on Earth can receive those signals. When
a GPS antenna receives signals from at least four satellites, a computer connected
to that antenna can mathematically calculate the antenna's latitude, longitude, and
sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used
for storing data (such as names, addresses, appointments or notes) and utilizing
computer programs. Some PDAs also function as wireless communication
devices and are used to access the Internet and send and receive e-mail. PDAs
usually include a memory card or other removable storage media for storing data
and a keyboard and/or touch screen for entering data. Removable storage media
include various types of flash memory cards or miniature hard drives. This
removable storage media can store any digital data. Most PDAs run computer
software, giving them many of the same capabilities as personal computers. For
example, PDA users can work with word-processing documents, spreadsheets,

9

and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

18.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://www.apple.com/iphone-se, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

19.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensic tools.

20.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

      a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

21.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

11

22.    *Manner of execution.*   Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.   Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

23.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

_____
Jeffrey Weeks
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on August 22, 2018:

_____
HON. G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

12